**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Linda Gavin

   v.                                          Civil No. 11-cv-159-LM
                                                Opinion No. 2012 DNH 154
Liberty Mutual Group Inc.


**O R D E R**

In a case that has been removed from the New Hampshire
Superior Court, Linda Gavin is suing her former employer,
Liberty Mutual Group Inc. ("Liberty Mutual"), in three counts,
asserting claims for constructive discharge (Count I), wrongful
termination (Count II), and enhanced compensatory damages (Count
III).[1]  Before the court are: (1) Liberty Mutual's motion for
summary judgment; and (2) its motion to strike portions of
Gavin's memorandum of law in opposition to summary judgment and
her affidavit in support thereof.[2]  Gavin objects to both
motions.  For the reasons that follow, Liberty Mutual's motion

_____

[1] Gavin makes her request for enhanced compensatory damages
in a separate count, but both parties appear to agree that her
complaint actually asserts only two claims: one for constructive
discharge and one for wrongful termination.  The court agrees
with the parties.  See Minion Inc. v. Burdin, 929 F. Supp. 521,
523 (D.N.H. 1996) ("Under New Hampshire law, a claim for
enhanced damages is not a separate cause of action; it is a
request for a particular remedy.").

[2] Also filed, but not yet ripe for decision, is Liberty
Mutual's motion to compel.

for summary judgment is granted and, as a result, its motion to strike is denied as moot.

## Summary Judgment Standard

"To prevail on summary judgment, the moving party must show that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Markel Am. Ins. Co. v. Díaz-Santiago, 674 F.3d 21, 29 (1st Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). "[A]n issue of fact is genuine if 'a reasonable jury could resolve it in favor of either party.'" Markel, 674 F.3d at 29-30 (quoting Basic Controlex Corp. v. Klockner Moeller Corp., 202 F.3d 450, 453 (1st Cir. 2000)). "In determining whether a genuine issue of material fact exists, [the court] construe[s] the evidence in the light most favorable to the non-moving party and make[s] all reasonable inferences in that party's favor." Markel, 674 F.3d at 30 (citing Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004)).

"The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a trialworthy issue persists." Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)). "However, 'a conglomeration of conclusory allegations, improbable inferences, and unsupported speculation is insufficient to discharge the nonmovant's burden.'" Sánchez-Rodríguez, 673 F.3d at 9 (quoting DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005)). "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

## Background

The following factual recitation is drawn largely from the statement of undisputed material facts in Liberty Mutual's memorandum of law.  While Gavin devotes a considerable portion

of her memorandum to a host of factual issues, she challenges
only two of the facts from Liberty Mutual's statement in the
manner required by the Local Rules of this district.  That is,
she does not respond to Liberty Mutual's factual statement by
incorporating into her memorandum "a short and concise statement
of material facts, supported by appropriate record citations, as
to which [she] contends a genuine dispute exists so as to
require a trial."  LR 7.2(b)(2).  That said, the court turns to
the basic facts of this case.

Gavin began working for Liberty Mutual in 2002.  In 2004,
she was promoted to the position of assistant controller in the
cash-management department.  Her immediate superior was John
Salmon.  "In November of 2007, Mr. Salmon . . . met with [Gavin]
regarding her job performance and provided her a detailed
memorandum regarding her shortcomings with regard to
communication and other issues."  Def.'s Mem. of Law (doc. no
26-1), at 3.  Liberty Mutual supports that statement with a copy
of the memorandum Salmon gave Gavin.  Gavin attempts to create a
triable issue regarding the November 2007 meeting in the
following way:

> Liberty [Mutual] now also claims in its Motion for
> Summary Judgment ("Motion") that Salmon had discussions
> with Gavin in late 2007 detailing instances of Gavin's
> communication problems.  This flies in the face of the
> draft warning prepared by Salmon as to [a] January 16,
> 2008 meeting, and attached hereto as Exhibit O.  No
> reasons for a performance warning are set out in Exhibit
> O, and the reasons are simply marked with three (3) x's.

4

> More significantly, Exhibit O states after the three (3)
> x's "how do you feel about this/Are you surprised by it?"
> If Salmon had met with Gavin and had given her detailed
> instances of Gavin's communication problems or other
> issues prior to the January 16, 2008 meeting, it would
> make no sense to ask her "how do you feel about this/Are
> you surprised by it?"

Pl.'s Mem. of Law (doc. no. 28-1), at 15 (emphasis in the

original).  While Gavin appears to suggest that Salmon did not

meet with her in November of 2007 or did not talk to her about

communication problems, she did not deny either the fact of the

November discussion or its content in the affidavit she

submitted in support of her objection to summary judgment.  In

any event, Gavin's speculation and inferences, see Sánchez-

Rodríguez, 673 F.3d at 9, are insufficient to create a factual

basis from which a reasonable jury could find either that Salmon

did not meet with her in November of 2007, or that he did not

discuss her job performance with her, which are the relevant

factual statements she appears to challenge, see Markel, 674

F.3d at 29-30 (describing the dimensions of a genuine issue of

fact, for purposes of summary judgment).

On January 4, 2008, Gavin sent an e-mail containing

confidential information about another employee by using the

"reply all" button rather than the "reply" button, which

resulted in the transmission of that information to people who

should not have received it.  Salmon got the e-mail and went to

Gavin's office to speak with her about it.  When he saw how
upset she was, he told her to go home.

Gavin did go home, and reported to Liberty Mutual that she
was ill and would be out of work for some time.  She returned to
work on January 16, having used approximately eight days of
flexible time off ("FTO"), which was one of her employment
benefits.  The day Gavin returned to work, Salmon met with her
to discuss her performance.  At that meeting, Salmon gave Gavin
two options.  The first was to continue as an assistant
controller in the cash-management department and receive a
written warning concerning her job performance.  The second was
to take a six- to nine-month assignment in the treasury
department, while receiving her full compensation and benefits.
Salmon told Gavin that if she took the second option, and did
not obtain another position at Liberty Mutual before the
temporary position expired, she would be eligible for severance
pay.  "During the January 16, 2008 meeting, [Gavin] informed Mr.
Salmon that she would accept the temporary position in the
Treasury Department."  Def.'s Mem. of Law (doc. no. 26-1), at 5.
Although Gavin disputes the voluntariness of her acceptance of
the temporary position, she does not dispute the fact that she
accepted the position, on whatever terms it was offered.

On March 19, Gavin sent a letter to Salmon that stated, in
pertinent part: "I hereby submit my resignation from my position

at Liberty Mutual effective April 4, 2008." Def.'s Mot. Summ.

J., Ex. D (doc. no. 26-5). At her deposition, Gavin was asked

why she did not stay at Liberty Mutual through the end of her

temporary assignment. She explained her early departure this

way:

> I did what any reasonable person would do under the
> circumstances. I had a family. I had a kid in
> college. I was in a temporary position that I knew
> . . . would end. It was a poor economy. I mitigated
> my losses by looking [for] and obtaining a full-time
> permanent job.

Def.'s Mot. Summ. J., Ex. A (Gavin Dep., doc. no. 26-2), at 43.

Based on the foregoing, Gavin asserts claims for

constructive discharge and wrongful termination.

**Discussion**

<u>A. Constructive Discharge</u>

In Count I, Gavin asserts that Liberty Mutual is liable for

constructive discharge because it made her working conditions so

intolerable that she was forced to leave her job. While Count I

incorporates by reference the factual allegations in the thirty-

one paragraphs of the complaint that precede it, the four

paragraphs of Count I do not specify the working conditions on

which the constructive-discharge claim is based. Liberty Mutual

argues that it is entitled to summary judgment on Count I

because: (1) Gavin abandoned her constructive-discharge claim

during her deposition;[3] and (2) she has not alleged treatment sufficiently egregious to state a claim for constructive discharge.[4]  Gavin disagrees.  There is, however, a more fundamental problem with Count I.

Both Gavin and Liberty Mutual treat Count I as if it asserts a free-standing claim.  It does not.  Rather, in the context of this case, constructive discharge is a way of satisfying the termination element of Gavin's wrongful-termination claim.  See Lacasse v. Spaulding Youth Ctr., 154 N.H. 246, 248-49 (2006) ("[t]he termination element of [the plaintiff's wrongful-termination] claim may be satisfied by proof of a constructive discharge"); see also Porter v. City of Manchester, 151 N.H. 30, 37 (2004) (constructive discharge alleged to satisfy element of constitutional claims); Karch v. BayBank FSB, 147 N.H. 525, 536 (2002) ("We hold that properly

---

[3] Liberty Mutual's argument is based on Gavin's repeated testimony that she was terminated on January 16, 2008.  See Def.'s Mot. Summ. J., Ex. A (doc. no. 26-2), at 4, 8.

[4] Liberty Mutual's argument is not without merit, given the complaint's vagueness and thinness on this point and the high bar for demonstrating working conditions sufficiently intolerable to result in a constructive discharge, see Porter v. City of Manchester, 151 N.H. 30, 42 (2004) ("the adverse working conditions must generally be ongoing, repetitive, pervasive, and severe") (quoting 2 M. Rothstein et al., Employment Law § 8.7, at 258 (1999)); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment.") (quoting Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992)).

alleging constructive discharge satisfies the termination component of a wrongful discharge claim.").

In Jeffery v. City of Nashua, the New Hampshire Supreme Court held "that an action for constructive discharge accrues when the employee tenders the resignation or retirement notice," ___ N.H. ___, ___, No. 2011-516, 2012 WL 2094404, at *4 (June 12, 2012), which might suggest that New Hampshire recognizes a free-standing cause of action for constructive discharge.  But, in Lacasse, Porter, and Karch, the New Hampshire Supreme Court's three principal constructive-discharge opinions, constructive discharge was not a free-standing claim, but was a method of proving an element of another claim.

The same holds true for most the opinions from other jurisdictions on which the court relied in Jeffery.  See Whye v. City Council, 102 P.3d 384, 385 (Kan. 2004) (plaintiff alleged constructive discharge as an element of a wrongful-termination claim); Daniels v. Mut. Life Ins. Co., 773 A.2d 718, 719 (N.J. Super. Ct. App. Div. 2001) (plaintiff alleged constructive discharge in violation of two New Jersey statutes); Flaherty v. Metromail Corp., 235 F.3d 133, 136 (2d Cir. 2000) (plaintiff alleged constructive discharge as an element of claims under federal, state, and local gender- and age-discrimination laws); Univ. of Tex. Med. Branch v. Hohman, 6 S.W.3d 767, 772-73 (Tex. App. 1999) (holding that constructive discharge is termination

for purposes of Texas Whistleblower Act); Patterson v. Idaho
Dep't of Health & Welfare, 256 P.3d 718, 721 (Idaho 2011)
(plaintiff alleged constructive discharge in violation of two
Idaho statutes).

The judges of this district have also routinely held that
constructive discharge is not a cause of action.  See, e.g.,
Taite v. Peake, No. 08-cv-258-SM, 2009 WL 81137, at *4 n.4
(D.N.H. Jan. 12, 2009) ("Count IV is captioned 'constructive
discharge,' but there is no such cause of action under the
common law of New Hampshire."); Parker v. MVM, Inc., No. 05-cv-
380-SM, 2007 WL 1489612, at *5 (D.N.H. May 22, 2007) ("[A]s an
employee-at-will, Parker's remedies for an alleged constructive
discharge are limited to a tort claim for wrongful discharge.");
Scannell v. Sears Roebuck & Co., No. 06-cv-227-JD, 2006 WL
2570601, at *2 (D.N.H. Sept. 6, 2006) ("In her complaint,
Scannell characterizes her claims as constructive discharge.
For purposes of the present motion . . . both parties understand
her claim to allege wrongful termination.").

To conclude, this court is confident that if the New
Hampshire Supreme Court were to be presented directly with the
question, it would rule that "constructive discharge is not in
itself a cause of action [but] is a defense against the argument
that no suit should lie in a specific case because the plaintiff
left the job voluntarily."  Bohn v. Herald Publ'g Co., No. 11-

10618, 2012 WL 1802621, at *7 (E.D. Mich. May 17, 2012) (quoting

Vagts v. Perry Drug Stores, Inc., 516 N.W.2d 102, 104 (Mich. Ct.

App. 1994)).  That is, based on the New Hampshire Supreme

Court's own constructive-discharge jurisprudence, there is every

reason to believe that court would agree with Judge Anderson's

recent explication:

> [C]onstructive discharge is not a cause of action even
> though it is routinely alleged as a separate count in
> complaints for wrongful discharge.  Because
> constructive discharge is not an independent cause of
> action, an underlying cause of action for wrongful
> termination from employment must exist for the claim
> to be valid.

Hogwood v. Town of Oakland, No. 11-2396-STA-dvk, 2012 WL

1414000, at *3 (W.D. Tenn. Apr. 23, 2012) (footnotes omitted).

Because constructive discharge is not a cause of action,[5] Liberty

Mutual is entitled to judgment as a matter of law on Count I.

The unavailability of constructive discharge as a cause of

action, however, does not preclude Gavin from alleging and

proving constructive discharge to establish the termination

element of her wrongful-termination claim.

---

[5] Gavin's decision to assert a claim for constructive
discharge may have been influenced by her erroneous belief that
an "employee has the right not to be discharged . . . unless the
employer has a reasonable cause to do so."  Pl.'s Mem. of Law
(doc. no. 28-1), at 22.  Gavin has alleged no facts to suggest
that she was anything other than an employee at will, and her
claim for wrongful termination, is based on a cause of action
created specifically to protect the rights of employees at will.
As an employee at will, Gavin was subject to termination without
cause.  See Cloutier v. Great Atl. & Pac. Tea Co., 121 N.H. 915,
919 (1981).

B. Wrongful Termination

In Count II of her complaint, Gavin alleges that Liberty Mutual terminated her in bad faith, retaliation and/or malice, and further accuses Liberty Mutual of terminating her for performing four acts that public policy would encourage and refusing to perform one act that public policy would condemn. Specifically, she alleges that she was terminated for:

> making reasonable use of [her] sick/vacation or paid time off which was a promised benefit of [her] employment with Liberty [Mutual];

> taking advantage of procedures in the Liberty [Mutual] Employee Handbook such as confidentially reporting the treatment of a supervisor to the Human Resources Department;

> insisting on being provided with a warning that her performance was unsatisfactory and that she would be counseled about specific changes that were required to bring her performance to satisfactory levels and that she would then be placed on probation pursuant to the Liberty [Mutual] Employee Handbook;

> doing her job and working hard; and

> refusing [to] sign a so-called "Severance Agreement and General Release" under duress.

Compl. (doc. no. 1-1) ¶ 38.  Liberty Mutual moves for summary judgment on Count II, arguing that: (1) Gavin was not terminated; (2) her claim is untimely; and (3) even if she can establish that she was terminated, she cannot satisfy the public-policy element of a wrongful-termination claim.  Liberty Mutual's third argument carries the day.

12

## 1. Gavin's Theory of the Case

Gavin's position regarding the timing of her discharge is somewhat difficult to discern.  She alleges in her complaint that she was terminated and/or constructively discharged on March 28, 2008, but does not indicate the significance of that particular date.  See Compl. (doc. no. 1-1) ¶ 6.  At her deposition, she testified, rather emphatically, that she was terminated on January 16, 2008, the day on which she returned from FTO leave and met with Salmon.  See Def.'s Mot. Summ. J., Ex. A (doc. no. 26-2), at 4, 8.  In her affidavit and in her objection to summary judgment, Gavin says she was terminated on April 4, the effective date of her resignation.  See Pl.'s Mem. of Law (doc. no. 28-1), at 13; Pl.'s Obj., Ex. A (doc. no. 28-2) ¶ 3.

Gavin's position on how she was discharged is even more difficult to discern.  She appears to rely on the doctrine of constructive discharge.  But, she is not as clear as she might be about how, precisely, "her employer rendered her working conditions so difficult and intolerable that a reasonable person would [have felt] forced to resign," Jeffery, 2012 WL 2094404, at *2 (citation omitted).  In her complaint, she refers to the imposition of an unreasonable workload beginning in 2007, see Compl. (doc. no. 1-1) ¶¶ 12-13, and to hostile treatment from Liberty Mutual's human resources department ("HR") and from

Salmon after she attempted to address her workload issues with HR, see id. ¶ 14-15.  She also alleges that Salmon treated her with "public disrespect and scorn," gave her "dirty looks," and spoken to her "harshly . . . in front of other employees, including [her] subordinates."  Id. ¶ 13.  She does not allege when Salmon subjected her to that treatment, but the context of her complaint suggests that she is alleging that it occurred before January 16.  The complaint appears to include no allegations about the way Salmon or anyone else from Liberty Mutual treated Gavin after January 16.

In her affidavit, Gavin avers that while performing the duties of the temporary position, i.e., after January 16, "Salmon . . . ignored [her] and he rendered the working conditions of her employment so difficult that [she] felt [she] had no reasonable choice but to leave Liberty Mutual."  Doc. no. 28-2 ¶ 24.  She also says that Salmon made her working conditions intolerable by having her perform both her old job and her new one simultaneously.  See id. ¶ 23.

In her memorandum of law, in a discussion of her constructive-discharge claim, Garvin says that Liberty Mutual made her working conditions intolerable by: (1) criticizing her, with no basis, for communication and other performance problems; (2) threatening her with a performance warning; (3) denying her the opportunity to take advantage of the company's employment

14

policies and procedures; and (4) forcing her to take the
temporary position and, for a time, requiring her to perform
both her old job and the new one at the same time.  See doc. no.
28-1, at 22-23.  She continues:

> After the January 16, 2008 meeting, Salmon
> essentially ignored Gavin, rendering her working
> conditions intolerable.
>
> Finally, Gavin was forced to accept the temporary
> position and was told it would only last six to nine
> months and she then would be "terminated".  Clearly,
> that put Gavin in an intolerable position knowing that
> she would be terminated anywhere from six to nine
> months after being given the temporary position.

Id. at 23 (emphasis in the original).

As noted above, Gavin argues in her memorandum of law that
she "was terminated by being forced to accept the temporary
position," Pl.'s Mem. of Law (doc. no. 28-1), at 21, and that
"[Janna] Mullane and Salmon, in essences [sic], terminated Gavin
by forcing her to take the temporary position, which in essence
resulted in the termination of her employment," id.  That sounds
more like an actual termination than a constructive discharge,
and if, indeed, Gavin means to argue that she was terminated
during her January 16, 2008, meeting with Salmon, then there
could be some merit to Liberty Mutual's argument that Gavin's
claim is time-barred, given that her complaint is dated February
24, 2011.  Moreover, if Liberty Mutual made Gavin's working
conditions intolerable by forcing her to take the temporary

15

position on January 16, which is a fair inference from her
reliance on the theory of constructive discharge, it would be
legitimate to wonder why she did not submit her resignation for
another two months, but the court need not resolve that
conundrum.  At the very least, Gavin is not especially
consistent about identifying what, precisely, constituted her
termination.

Notwithstanding Gavin's failure to clearly articulate a
theory regarding when and how she was terminated, the court will
give Gavin every possible benefit of the doubt.  For the purpose
of ruling on Liberty Mutual's motion for summary judgment, the
court will assume that Gavin was constructively discharged by
Liberty Mutual on March 19, 2008,[6] for: (1) taking FTO leave in
January of 2008;[7] and (2) "insisting . . . that she be provided
with the benefits of the applicable Liberty [Mutual]

_____

[6] Because "an action for constructive discharge accrues when
the employee tenders the resignation or retirement notice,"
Jeffery, 2012 WL 2094404, at *4, the court cannot assume that
Gavin was discharged on April 4, 2008, the date on which her
resignation became effective.

[7] Because Gavin returned from her FTO leave on January 16,
only conduct by Liberty Mutual after that date could have
contributed to a constructive discharge in retaliation for
taking that leave.  As the complaint makes few if any
allegations about conduct directed toward Gavin after January
16, it is not at all clear that Gavin's claim that she was
constructively discharged for using FTO leave could survive a
motion to dismiss under Rule 12(b)(6) of the Federal Rules of
Civil Procedure.

[employment] policies and procedures,"[8] Pl.'s Mem. of Law (doc. no. 28-1), at 26.  These two acts, which are a subset of those alleged in the complaint, are the only ones Gavin discusses in her objection to summary judgment.

### 2. The Law of Wrongful Termination

In New Hampshire, to prevail on a claim for wrongful termination, or wrongful discharge, as the cause of action is also known, a plaintiff must establish that: "(1) [her] termination was motivated by bad faith, retaliation or malice; and (2) that [she] was terminated for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." MacKenzie v. Linehan, 158 N.H. 476, 480 (2009) (citation omitted).  Thus, "[t]he first prong focusses on the nature of the employer's actions, while the public policy prong pertains to the employee's acts." Duhy v. Concord Gen. Mut. Ins. Co., No. 1:08-cv-00192-JL, 2009 WL 1650024 (D.N.H. June 10, 2009) (quoting Antonis v. Elecs. for Imaging, Inc., No. 07-cv-163-JL, 2008 WL 5083979, at *3 (D.N.H. Nov. 25, 2008; citing Porter, 151 N.H. at 39)).  "[O]rdinarily the issue of whether a public policy exists is a question for

---

[8] Given the lack of specificity in the complaint concerning the manner in which Gavin asserted her rights under Liberty Mutual's policies and procedures, it is not at all clear that her claim that she was constructively discharged for asserting her rights under company policies could survive a motion to dismiss under Rule 12(b)(6).

the jury, [but] at times the presence or absence of such a
public policy is so clear that a court may rule on its existence
as a matter of law." Short v. Sch. Admin. Unit No. 16, 136 N.H.
76, 84 (1992) (citing Cloutier v. Great Atl. & Pac. Tea Co., 121
N.H. 915, 924 1981)); see also MacKenzie, 158 N.H. at 480.  This
is one of those times.

### 3. Use of Leave Time

In reliance on Duhy, Liberty Mutual argues that "the 'act'
of taking sick or vacation days does not constitute an
actionable public policy."  Def.'s Mem. of Law (doc. no. 26-1),
at 9.  Liberty Mutual's point is well taken.  In Duhy, the
plaintiff contended that her former employer "wrongfully
terminated her employment in retaliation for her obtaining
medical treatment, taking time off for illness, and allowed use
of vacation, sick and other time . . ."  2009 WL 1650024, at *10
(internal quotation marks omitted).  Judge Laplante rejected
that argument:

> Duhy's wrongful discharge claim ultimately founders
> because she fails to persuade the court that New
> Hampshire law recognizes the public policies she has
> suggested.  . . .  Duhy presents no authority — under
> New Hampshire law or elsewhere — or convincing
> argument supporting her claim that, as a broad
> proposition, public policy encourages employees to
> take vacation days . . . .  While there undoubtedly
> are specific circumstances where public policy could
> encourage employees to engage in the activities
> offered by Duhy (e.g., obtaining medical treatment to
> address a highly contagious virus), there are myriad

> scenarios where public policy would not (e.g.,
> malingering, taking excessive vacation, filing bogus
> insurance claims).  Based on a review of all the
> evidence in this case, viewed in the light most
> favorable to Duhy, the court cannot conclude, and New
> Hampshire law has not held, that there is a public
> policy encouraging employees to engage in the sort of
> conduct for which Duhy alleges she was fired.

Id. at *10-11.

Duhy is on point and persuasive.[9]  Gavin has presented no

legal authority stating a public policy that would encourage

employees to take sick leave.  Her argument, such is it is,

consists of nothing more than a bare statement that her use of

FTO leave "under these circumstances was an act public policy

would encourage."  Pl.'s Mem. of Law (doc. no. 28-1), at 25.

Based on the persuasive reasoning of Duhy, this court has little

difficulty concluding, as a matter of law, that Gavin did not

perform an act that public policy would encourage when she took

sick leave.  See Henderson v. NutriSystem, Inc., 634 F. Supp. 2d

521, 536 (E.D. Pa. 2009) (rejecting plaintiff's reliance on "a

'right under the state's law protecting employees' medical leave

of absence'" where plaintiff did "not provide references to any

state laws, regulations or opinions of the Pennsylvania courts

---

[9] Gavin attempts to distinguish Duhy, noting that she has
not asserted a claim that "she was terminated related to FMLA
issues."  Pl.'s Mem. of Law (doc. no. 28-1), at 25.  Gavin's
argument misses the mark because Judge Laplante's analysis of
the Duhy plaintiff's wrongful-termination claim focused on her
use of employer-granted vacation time, not FMLA leave.  See 2009
WL 1650024, at *10.

that would establish a 'clear mandate' of public policy sufficient to override the at-will employment relationship").

It is clear from the New Hampshire Supreme Court's wrongful-termination jurisprudence that for a viable wrongful-termination claim to lie, the plaintiff's action or inaction must have been consistent with the dictates of public policy. See MacKenzie, 158 N.H. at 480; Lacasse, 154 N.H. at 248.  In Cloutier, for example, public policy in the form of federal work-safety statutes supported a store manager's decision not to force a subordinate to pass through a "very dangerous" area to make bank deposits.  See 121 N.H. at 922-23.  Similarly, public policy in the form of state wage-and-hour laws supported the same store manager's decision not to come in on his statutorily mandated day off to make the bank deposits he did not force his subordinate to make.  See id. at 923-24.  Here, by contrast, the public has no interest in Gavin's use of the FTO leave Liberty Mutual made available to her.

### 4. Insistence on Adherence to Company Policies

The second part of Gavin's public-policy argument falls just as flat as the first.  In reliance on Melvin v. NextEra Energy Seabrook, LLC, No. 09-cv-249-JD, 2010 WL 99095 (D.N.H. Jan. 6, 2010), Liberty Mutual argues that "complaints that an employer did not follow its internal policies, or that it did so

inconsistently, do not satisfy the public policy element of a
wrongful termination claim."  Def.'s Mem. of Law (doc. no. 26-
1), at 12.  Gavin responds:

> Gavin asserts she was discharged for asserting all of
> the rights provided to her by the Liberty policies and
> as set out above.  Specifically, these rights include
> looking for assistance from the Human Resources
> department, asking to be placed within the discipline
> process after being threatened with a written warning,
> asking for a written explanation of the basis for the
> performance warning, and demanding that she be treated
> fairly and honestly.  As testified to by Augusta,
> Mullane, Salmon, these are all policies that Liberty
> was obligated to follow and provide to Gavin.  After
> moving forward to assert her rights to these Liberty
> policies and procedures, Gavin was in fact, forced to
> take the temporary position, resulting in her
> termination.  As a result, Gavin asserts she was
> terminated for insisting, as public policy would
> dictate, that she be provided with the benefits of the
> applicable Liberty policies and procedures.[10]

Pl.'s Mem. of Law (doc. no. 28-1), at 25-26.  That, however, is
quite literally all Gavin has to say about the public policy
that purportedly encouraged her to press Liberty Mutual to abide
by its policies.  Beyond flatly asserting that public policy
supports her actions, Gavin neither articulates any public
policy that encouraged her actions nor identifies the source(s)
of any such policy.  For that reason alone, Liberty Mutual is

---

[10] Of the four attempts to assert her rights that Gavin
mentions in her memorandum of law, only the first one is
mentioned in her complaint.  See doc. no. 1-1 ¶ 14.  Only the
first and the third are mentioned in her affidavit.  See doc.
no. 28-2 ¶¶ 11, 19-20.  Beyond that, the court notes that
Gavin's complaint says nothing about her being threatened with a
written warning.

entitled to summary judgment.  See Short, 136 N.H. at 86 ("a
plaintiff must articulate a public policy in order to make out a
claim for wrongful termination under State law").

Further support for Liberty Mutual's position comes from
Melvin.  In that case, the plaintiff contended "that his
employment was terminated because he disagreed with [his
employer]'s allegedly selective enforcement of its policies or
its management of his supervisory role."  2010 WL 99095, at *3.
Judge DiClerico rejected that argument:

> [T]hose matters, as alleged, also would not implicate
> a public policy.  See, e.g., MacKenzie, 158 N.H. at
> 481 (holding that an employee's disagreement "about
> whether his conduct violated [his employer's] rule
> . . . [is] not an act that public policy would
> protect"); Short, 136 N.H. at 84 ("[A]n employee's
> expression of disagreement with a management decision
> is not an act protected by public policy.")

Id. (parallel citations omitted).

The analysis Judge DiClerico employed in Melvin would seem
to foreclose a wrongful-termination claim based on Gavin's
alleged assertion of her rights under Liberty Mutual's policies.
Moreover, Gavin does not even attempt to distinguish Melvin,
MacKenzie, or Short.  In sum, as with Gavin's use of FTO leave,
the public has no interest in Gavin's attempt to compel Liberty
Mutual to comply with its internal policies and procedures.

**Conclusion**

Because Gavin has failed to articulate a public policy that would encourage any of the acts for which she says she was constructively discharged, Liberty Mutual's motion for summary judgment, document no. 26, is granted.  In light of that ruling, Liberty Mutual's motion to compel, document no. 33, its motion to strike, document no. 36, and its motion for leave to file a reply memorandum, document no. 40, are all denied as moot.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


September 5, 2012

cc:   Debra Weiss Ford, Esq.
      Douglas J. Hoffman, Esq.
      John E. Lyons, Jr., Esq.
      Daniel P. Schwarz, Esq.
      K. Joshua Scott, Esq.